**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Redline Metals, Inc., | ) | NO. 24-12590 |
| Debtor. | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | Honorable Judge Jacqueline P. Cox |

## NOTICE OF MOTION

TO: See attached list

PLEASE TAKE NOTICE that on September 10, 2024, at 1:30 p.m., I will appear before the Honorable Jacqueline P. Cox, or any judge sitting in that judge's place, either in courtroom 680 of the Dirksen Federal Building, 219 S. Dearborn, Chicago, Illinois, or electronically as described below, and present the motion of Redline Metals, Inc.'s **MOTION OF THE DEBTOR FOR (A) ENTRY OF INTERIM ORDER AUTHORIZING THE DEBTOR TO PAY OR HONOR PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS AND (B) SCHEDULING OF A FINAL HEARING,** a copy of which is attached.

Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person. To appear by Zoom using the internet, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode. To appear by Zoom using a telephone, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode. Meeting ID and passcode. The meeting ID for this hearing is 161 273 2896, and the passcode is 778135. The meeting ID and passcode can also be found on the judge's page on the court's web site.

If you object to this motion and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

By: /s/ Paul M. Bach
Mr. Paul M. Bach, Esq.
Ms. Penelope N. Bach, Esq.
Bach Law Offices, Inc.
Attorneys At Law
P.O. Box 1285
Northbrook, Illinois 60062
Phone (847) 564 - 0808

<u>Certificate of Service</u>

I, Paul Bach, hereby certify that I caused a copy of this notice to be served by ECF Electronic Delivery on the service list below upon the above parties listed on September 6, 2024 from Northbrook, IL. (Additional Proof of Service for Largest Twenty Unsecured Creditors by U.S. Mail).

BY:   S/ PAUL M. BACH
BACH LAW OFFICES, INC.
P.O. BOX 1285
NORTHBROOK, IL 60062
PHONE:  (847)564 0808
ATTORNEY NO: 6209530

SERVICE LIST

**Patrick Laying, Office of the US Trustee**
Region 11
219 S Dearborn Street Rm 873
Chicago, IL 60604

**Edmond M Burke**
Chuhak & Tecson, P.C.
120 S. Riverside Plaza
Suite 1700
Chicago, IL 60606

**Kurt M. Carlson**
Carlson Dash LLC
216 S. Jefferson St.
Suite 303
Chicago, IL 60661

**Amy E Daleo**
Cohon Raizes & Regal LLP
300 S. Wacker Drive
Suite 500
Chicago, IL 60604

**William J Factor**
William J. Factor
105 W. Madison St.
Suite 2300
Chicago, IL 60602

**Eric J Malnar**
Huck Bouma PC
1755 South Naperville Road
Suite 200
Wheaton, IL 60189

**Morgan I Marcus**
Carlson Dash, LLC
216 S Jefferson St
Ste 504
Chicago, IL 60661

**John R O'Connor**
Levenfeld Pearlstein LLC
120 S. Riverside Plaza
Ste. 1800
Chicago, IL 60606

**Edgar A Quintero**
Chuhak & Tecson, P.C.
120 S. Riverside Plaza
Ste 1700
Chicago, IL 60606

**Lina Toma**
Carlson Dash LLC
216 S. Jefferson Street
Suite 504
Chicago, IL 60661

**Adam B. Rome**
Greiman, Rome & Griesmeyer, LLC
205 West Randolph
Suite 2300
Chicago, IL 60606

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Redline Metals, Inc., | ) | NO. 24-12590 |
| Debtor. | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | Honorable Judge Jacqueline P. Cox |

## MOTION OF THE DEBTOR FOR (A) ENTRY OF INTERIM ORDER AUTHORIZING THE DEBTOR TO PAY OR HONOR PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS AND (B) SCHEDULING OF A FINAL HEARING

Redline Metal, Inc., (the "Debtor"), by and through its proposed undersigned counsel, Paul M. Bach and Penelope N. Bach of Bach Law Offices, Inc., hereby submits this motion (the "Motion") for entry of interim and final orders, authorizing the Debtor to pay or honor prepetition obligations to certain critical vendors and scheduling a hearing.  In further support of this Motion, the Debtor respectfully states as follows:

### JURISDICTION

1.  This Court has jurisdiction over this case, the Debtor, property of the Debtor's estate and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.  The Debtor consents to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4

4. The statutory bases for the relief requested in this Motion are sections 105(a), 363(b), 364, 503(b), 507(a), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

5. On August 27, 2024, (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a). No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

6. Headquartered in Lombard, Illinois the Debtor owns and operates a scrap metal recycling business where the Debtor buys metal buy from manufacturers and other scrap dealers and the public to sell to mills for re melt of the metal.

7. The heart of the Debtor's supply chain is purchasing scrap metal from individuals and businesses.  Without this supply the Debtor will be unable to sell metal to end users.

### A. The Critical Vendor Claims

8.  The Debtor believes that the payment of the Critical Vendor Claims (as defined below) is vital to the Debtor's ability to continue to purchase metal on a timely, dependable basis to its customers without interruption and, thus, to its efforts to preserve and maximize value for all stakeholders during this chapter 11 case.

9. The Debtor believes that many of its vendors and service providers will continue to do business with it after commencement of this case because doing so simply makes good business sense. In some cases, however, the Debtor anticipates that certain of the Debtor's vendors that are critical to the Debtor's uninterrupted operations (the "Critical Vendors," which claims will be identified as the "Critical Vendor Claims") will: (a)

5

refuse to deliver metal without payment of some or all of their prepetition claims; or (b) refuse to deliver metal on reasonable price or credit terms absent payment of some or all of their prepetition claims, thereby effectively refusing to do business with the Debtor.

10.  Accordingly, the Debtor requests authorization to pay the Critical Vendor Claims of such vendors and service providers in its discretion and subject to the criteria below, because payment of such claims is necessary to the continued and uninterrupted operations of the Debtor.

**B. Stringent Criteria Will Be Used to Identify Critical Vendors.**

11. To ensure that the Debtor identified as Critical Vendors those vendors and service providers that are actually critical to the Debtor's business, and who will refuse to, or who will demand pricing or trade terms that constitute an effective refusal to, provide metal if not paid, certain of the Debtor's employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtor's vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtor's immediate needs for metal.

12. The Debtor has used, and will continue to use, the following non-exhaustive criteria to determine which of the Debtor's vendors and service providers are Critical Vendors: (i) (a) whether the vendor or service provider is a sole, limited, or high value source provider of metal critical to the business operations of the Debtor; (b) whether no or few alternative vendors are available that can provide requisite volumes of similar metal on equal or better terms to the Debtor; (c) whether the Debtor could not continue to operate while transitioning business to an alternative vendor or source of supply; (d) whether replacement costs, including pricing, transition expenses and lost sales, exceed the amount of the vendor's outstanding invoices to a significant degree; (e) whether a

vendors' prepetition claim is entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code; (f) whether an agreement exists by which the Debtor could compel the vendor to perform; or (g) whether specifications, permit or contract requirements prevent, directly or indirectly, the Debtor from obtaining metal from an alternative vendor or source; *and* (ii) whether failure to pay all or a part of the invoices of a vendor or service provider who meets any of the aforementioned standards in (a) through (g) could result in financial distress for the vendor such that the Debtor's ability to continue operating would be jeopardized. The Debtor is confident that this process has appropriately identified, and will continue appropriately to identify, only those vendors and service providers that are critical to the estate.

### C. Description of Critical Vendors

13. The Debtor believes that if it fails to pay the Critical Vendor Claims owed to certain of its suppliers of metal on a timely basis, its existing relationships with such suppliers and service providers will be negatively impacted, resulting in either outright refusal to continue to supply such metal post-petition or a willingness to only supply such metal at unfavorable prices for the Debtor in the future.

14. The Debtor's Critical Vendors include vendors in which the Debtor purchases metal of some type.  The proposed interim Critical Vendors are stated on the attached Exhibit.

Losing these critical suppliers would immediately put the Debtor's relationships with its key customers in serious jeopardy. At a minimum, finding replacement suppliers would disrupt service and in turn stall the Debtor's customer's sale of melted down metal and relationships with such customers.

7

15. Overall, any disruption in the continuous supply of metal from these Critical Vendors would jeopardize the Debtor's ability to provide services and increase costs in the short term, resulting in a substantial negative impact on the Debtor's revenues and enterprise value to the detriment of all parties in interest.

### D. Proposed Terms and Conditions for Payment of Critical Vendor Claims

16. The Debtor proposes to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying metal to the Debtor on trade terms that are the same or better than the trade terms that were most favorable in the 12 months prior to the Petition Date (the "Customary Trade Terms"). The Debtor reserves the right to negotiate new trade terms (the "Minimum Credit Terms") with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, that vary from the Customary Trade Terms to the extent the Debtor determines that such terms are necessary to procure essential metal or otherwise in the best interests of the Debtor's estate.

17. To ensure that the Critical Vendors deal with the Debtor on either Customary Trade Terms or Minimum Credit Terms, the Debtor will require execution by a Critical Vendor of a letter agreement (a "Trade Agreement") substantially in the form attached to this Motion.

18. The Debtor proposes that each Trade Agreement include, without limitation, the following terms:
(a) the amount of the relevant Critical Vendor's estimated Critical Vendor Claims, accounting for any setoffs, other credits and discounts thereto; *provided*, *however*, such amount shall be used only for the purposes of determining such Critical Vendor's claim under the Order and shall not be deemed a claim allowed by the Court, and the rights of

all interested persons to object to such claim shall be fully preserved until further order of this Court;

(b) the Critical Vendor's agreement to accept payment under the Trade Agreement in full and complete satisfaction of any and all amounts owed to the Critical Vendor by the Debtor for the period ending on the Petition Date;

(c) the Customary Trade Terms or Minimum Credit Terms applicable to such Critical Vendor, or such other terms as the Critical Vendor and the Debtor may agree, and the Critical Vendor's agreement to provide metal to the Debtor under such terms for the duration of the Chapter 11 Case unless the Debtor fails to make timely payments under the agreed-upon trade terms;

(d) the Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtor, its estate, any of the non-Debtor affiliates, or any other person or entity or any of its respective assets or property (personal) any lien (a "Lien"), a claim for reclamation (a "Reclamation Claim") or a claim under section 503(b)(9) of the Bankruptcy Code (a "503(b)(9) Claim"), regardless of the statute or other legal authority upon which such Lien, Reclamation Claim or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtor arising from agreements or other arrangements entered into prior to the Petition Date; and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien, Reclamation Claim or 503(b)(9) Claim, the Critical Vendor shall take (at such vendor's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim, unless the Critical Vendor's participation in the program to pay Critical Vendor Claims authorized by the Order is terminated; The

9

Debtor's entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims.

(e) the Critical Vendor's agreement not to file a motion to compel assumption or rejection of any contract under which the Critical Vendor Claim arises; and/or

(f) the Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Order sought hereby and is bound thereby.

19. By this Motion, the Debtor seeks only the authority to enter into Trade Agreements when the Debtor determines that payment of such Critical Vendor Claims is necessary to its post-petition operations and that such agreements are advisable. The Debtor also hereby seeks authority to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtor determines, in its business judgment that failure to pay such Critical Vendor Claims presents a material risk of irreparable harm to the Debtor's business and there is no reasonable likelihood that the Debtor will negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.

20. By agreeing to provide Customary Trade Terms or Minimum Credit Terms under a Trade Agreement, the Critical Vendors are extending unsecured post-petition credit to the Debtor for the benefit of all creditors. Such Customary Trade Terms or Minimum Credit Terms maintain the credit terms that the Debtor had prior to the Petition Date, or provide other acceptable credit terms, and may provide the Debtor with more favorable terms for unsecured credit than currently provided by the Critical Vendors or available elsewhere. Accordingly, the treatment of the valid Critical Vendor Claims set forth in this Motion in exchange for Customary Trade Terms or Minimum Credit Terms is in the best interests of the Debtor and its estate and should be approved in accordance with section 363(b) of the Bankruptcy Code.

21. Nothing in this Motion should be construed as a waiver by any of the Debtor of its

rights to contest any claim of any Critical Vendor under applicable non-bankruptcy law.

22. In the event that a Critical Vendor under a Trade Agreement refuses to supply

metal to the Debtor on Customary Trade Terms or Minimum Credit Terms following

receipt of payment on its Critical Vendor Claim, or otherwise fails to comply with its

Trade Agreement with the Debtor, the Debtor seeks authority to return the parties to the

positions they held immediately prior to entry of the Order approving this Motion with

respect to all prepetition claims. Further, the Debtor seeks authority without further order

of the Court, (a) to declare that any Trade Agreement between the Debtor and such

Critical Vendor is terminated; (b) to declare that payments made to such Critical Vendor

on account of its Critical Vendor Claims be deemed to have been in payment of then-

outstanding (or subsequently accruing) post-petition claims of such Critical Vendor

without further order of the Court or action by any person or entity; and (c) to recover or

seek disgorgement of any payment made to such Critical Vendor on account of its

Critical Vendor Claims to the extent that such payments exceed the post-petition

claims of such Critical Vendor, without giving effect to any rights of setoff, claims,

provision for payment of reclamation or trust fund claims, or other defense. In addition,

the Debtor reserves the right to seek damages or other appropriate remedies against any

breaching Critical Vendor.

22. The Debtor further proposes that any Trade Agreement terminated as a result of a
Critical Vendor's refusal to comply with the terms thereof may be reinstated if the

underlying default under the Trade Agreement is fully cured by the Critical Vendor not

later than five (5) business days following the Debtor's notification to the Critical Vendor

of such a default; or the Debtor, in its discretion, reach a favorable alternative agreement with the Critical Vendor.

23. The Debtor will also maintain a matrix summarizing (a) the name of each Critical Vendor, (b) the amount paid to each Critical Vendor on account of its Claim and (c) the metal provided by such Critical Vendor.

24. By this Motion, pursuant to sections 105(a), 363(e), 364, 503(b), 1107(a), and 1108 of the Bankruptcy Code, the Debtor seeks entry of an interim order, respectively, authorizing, but not directing, the Debtor to pay prepetition claims of certain of the Debtor's suppliers that are essential to the uninterrupted Debtor's business operations, nonpayment to which, in the Debtor's business judgment, would likely result in those suppliers halting their provision of metal to the Debtor. Such relief, including any and all authorizations or payments requested herein, shall be subject to and implemented in accordance with the provisions of any orders of this Court approving any debtor in possession financing for the Debtor, including any budget in connection therewith.

25. The payment of Critical Vendor Claims will be conditioned on the agreement of the applicable Critical Vendors (i) to continue metal to the Debtor on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtor immediately prior to the Petition Date; and (ii) to accept such payment in full and complete satisfaction of such Critical Vendor's Claims. The Debtor reserves the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim. Such relief, including any and all authorizations or payments requested herein, shall be subject to, and implemented in accordance with, the provisions of any orders of this Court approving any debtor in possession financing for the Debtor, including any budget in connection therewith.

## BASES FOR RELIEF REQUESTED

26. The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain circumstances. Courts have recognized each of these statutory provisions as valid authority for such payments.

### A.  This Court May Authorize Payment of the Critical Vendor Claims Under Sections 363 and 364 of the Bankruptcy Code.

27. Courts in this and other districts consistently authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. In authorizing such payments, those courts generally rely on legal theories rooted in sections 363 and 364 of the Bankruptcy Code. Specifically, section 363(b)(1) of the Bankruptcy Code authorizes the debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). *See, e.g.*, *In re MPC Computers, LLC*, Case No. 08-12667 (PJW) (Bankr. D. Del. Nov. 10, 2008) (authorizing, pursuant to section 363, the payment of prepetition claims of some suppliers); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (affirming bankruptcy court's decision under section 363 authorizing contractor to pay prepetition claims of some suppliers who were potential lien claimants). Courts in this and other circuits have indicated that the use of property of the estate outside of the ordinary course of business is proper where the debtor has a sound business purpose for doing so. *See e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (recognizing that courts routinely grant orders allowing payment to essential suppliers in order to preserve and maximize the debtors' estates); s*ee also Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223,

1226 (5th Cir. 1986) (holding that section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *United States Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction"); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions.");

*See Computer Sales Int'l. Inc. v. Fed. Mogul Global, Inc.* (*In re Fed. Mogul Global, Inc.*), 293B.R. 124, 126 (Bankr. D. Del. 2003) (citing *In re Martin*, 91 F.3d 389, 396 (3d Cir. 1996)) (holding that in terminating an executory contract in favor of entering into a new contract with a different vendor, the debtor was not required to show "severe hardship or burden," but rather only "a sound business justification for the proposed transaction").

28. Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. *In re ALH Holdings LLC*, 675 F. Supp.2d 462, 477 (D. Del. 2009) ("[A] court will not disturb the business decisions of loyal and informed directors 'if they can be attributed to any rational business purpose.'") (citing *Sinclair Oil Corp. v. Levien*, 280 A. 2d 717, 720 (Del. 1971)); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test'"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656

14

(S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) *overruled in part by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009)).

29. Additionally, where, as here, the relief at issue involves a request impacting the trade terms among the Debtor and the vendor, the relief may, where the appropriate showing has been made, be approved pursuant to section 364 of the Bankruptcy Code. *See In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (holding that, "completely consistent with the Bankruptcy Code;" payments to critical trade vendors have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation").

30. In the instant case, the Debtor assumed obtaining trade terms from its Critical Vendors in the development of its budget. Further, it is the Debtor's business judgment that the failure to pay the Critical Vendor Claims would have a material adverse impact on the day-today operations of its business, thereby prejudicing the Debtor's estate and all parties in interest. Indeed, failure to pay the Critical Vendor Claims would very likely significantly disrupt the Debtor's ability to provide timely, safe services by inhibiting the Debtor's access to the metal it needs the most. If certain Critical Vendors are unwilling to provide their metal post-petition because of their outstanding prepetition claims, the Debtor's operations would suffer dramatically, compromising the value of the Debtor's estate to the detriment of all creditors. Further, the relief requested in this Motion contemplates payments to be made to Critical Vendors that agree to provide metal on

Customary Trade Terms or Minimum Credit Terms, to the extent possible. As a result, the payment of such Critical Vendor Claims is consistent with and appropriate under sections 363 and 364 of the Bankruptcy Code. As detailed above, the metal provided by the Critical Vendors are vital to the Debtor's continuing business operations.

**B. The Court May Rely on the "Necessity of Payment" Doctrine and Its General Equitable Powers to Grant the Relief Sought in the Motion.**

31. The Court may authorize payment of prepetition claims to Critical Vendor under section 105(a) of the Bankruptcy Code and the "doctrine of necessity." Under section 105 of the Bankruptcy Code, this Court "may issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). For the reasons set forth above, and in light of the need for the Debtor to preserve the going concern value of its business, the relief requested in this Motion is proper and should be granted. *See Czyewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts are authorized to approve orders allowing payment of prepetition claims, which is necessary for the debtors to have a successful reorganization).

32. The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the chapter 11 case where the payment of such claims is necessary to the continued operations of a debtor's business and restructuring efforts. *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment). The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence. *See Just For Feet*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's

16

business by refusing to deliver new inventory on eve of debtor's key sales season); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (recognizing that the doctrine of necessity is derived from the court's equitable powers and allows debtors to make payment on prepetition claims to creditors who will refuse to supply services or material essential to the conduct of the debtors' business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Id.* at 175-176.

33. The Debtor has narrowly tailored the definition of Critical Vendors to include only those (virtually irreplaceable and entrenched) suppliers who provide metal that are essential to preserve the value of the Debtor's business as a going concern and nonpayment to which, in the Debtor's business judgment, would very likely result in those suppliers halting their provision of metal to the Debtor. In turn, the maintenance of the Debtor's business during the chapter 11 case is crucial to the Debtor's ability to preserve going concern and carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport, C. & S.W. R. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id*. at 309-14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*. *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will

place the [debtor's] continued operation . . . in serious jeopardy."). Hence, this Court

should exercise its equitable powers to grant the relief requested in this Motion.

**C. The Court Should Authorize Payment of the Critical Vendor Claims As a Valid Exercise of the Debtor's Fiduciary Duties**

34. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor, operating

its business as a debtor in possession is a fiduciary "holding the bankruptcy estate[s] and

operating the business[es] for the benefit of [their] creditors and (if the value justifies)

equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and

preserve the estate, including an operating business's going-concern value." *Id*.

35. The *CoServ* court has noted that there are instances in which a debtor in possession

can fulfill its fiduciary duty "by the preplan satisfaction of a prepetition claim." *Id*. That

court specifically noted that preplan satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a

substantial enhancement of the estate," and also when the payment was to "sole suppliers

of a given product." *Id*. at 498. The court provided a three-pronged test for determining

whether a preplan payment on account of a prepetition claim was a valid exercise of a

debtor's fiduciary duty:  First, it must be critical that the debtor deal with the claimant.

Second, unless it deals with the claimant, the debtor risks the probability of harm, or,

alternatively, loss of economic advantage to the estate or the debtor's going concern

value, which is disproportionate to the amount of the claimant's prepetition claim. Third,

there is no practical or legal alternative by which the debtor can deal with the claimant

other than by payment of the claim. *Id*.

18

36. Payment of the Critical Vendor Claims meets each element of the *CoServ* court's standard. As described above, the Debtor has narrowly tailored the Critical Vendor Claims to encompass only those vendors and service providers that satisfy the specific criteria described above and that refuse to, demand pricing or trade terms that constitute an effective refusal to provide metal to the Debtor on a post-petition basis if their prepetition balances are not paid. Even a brief respite from purchasing metal would stagnate the Debtor's operations and cost the Debtor's estate substantial lost revenues, which would severely impact the value of the Debtor's business. The potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform is grossly disproportionate to the amount of any prepetition claim that may be paid. Finally, prior to making a payment on account of a Critical Vendor Claim, the Debtor will have examined other options short of payment of Critical Vendor Claims and will have determined that, to avoid significant disruption of the Debtor's business operations, there exists no practical or legal alternative to payment of the Critical Vendor Claims. Therefore, the Debtor believes that paying the Critical Vendor Claims will allow it to discharge its fiduciary duties as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

**REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY**

37. The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this motion. Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the payments proposed in this Motion are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to sell its business as a

19

going concern. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### INTERIM APPROVAL SHOULD BE GRANTED AND A FINAL HEARING SHOULD BE SCHEDULED

38. The Debtor requests that the Court conduct a preliminary hearing on the Motion and, on an interim basis, grant the relief requested in this Motion. In addition, the Debtor respectfully requests that the Court schedule a final hearing on this Motion at the Court's convenience following entry of an interim order. Such relief is necessary in order to maintain and preserve the ongoing operations of the Debtor.

### RESERVATION OF RIGHTS

39. Nothing contained in this Motion is intended or should be construed as an admission as to the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtor expressly reserves its rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law. Likewise, if this Court grants the relief sought in this Motion, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

### NOTICE

40. Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the Northern District of Illinois; (ii) the parties on the Debtor's list of twenty (20)

largest creditors; (iii) Old Second National Bank; and (iv) any party that has requested

notice pursuant to Bankruptcy Rule 2002 or filed an appearance.

Due to the urgency of the circumstances surrounding this Motion and the nature of the

relief in it, the Debtor respectfully submits that no further notice of this Motion is

required.

## NO PRIOR REQUEST

41. No previous request for the relief sought herein has been made by the Debtor to this

or any other Court.

**WHEREFORE**, the Debtor respectfully request that the Court enter the Interim

Order and set a hearing for the entry of a Final Order, granting the relief requested in the

Motion and such other and further relief as may be just and proper.

Dated: September 5, 2024                    Respectively Submitted,
                                            Redline Metals, Inc.

                                            By: /s/ Paul M. Bach

Mr. Paul M. Bach, Esq.
Ms. Penelope N. Bach, Esq.
Bach Law Offices, Inc.
Attorneys At Law
P.O. Box 1285
Northbrook, Illinois 60062
Phone (847) 564 - 0808